NELSON v. HUNTER.

(Filed March 20, 1906).

*Slaves — Marriage — Offspring — Acts of 1866 and 1879—*
*Evidence.*

1. Upon the issue, "Is the plaintiff the legitimate child of J and S" (slaves), the question, "Did you ever hear S, after the surrender, say anything about going back to another wife," was properly excluded because it assumes the point in controversy—that S had another wife.

2. By virtue of the provisions of the Act of March 10, 1866, the relation of man and wife existing between former slaves, if continued until the passage of the act, culminated into a valid marriage and was legalized by the statute.

3. The Act of March 10, 1866, has a retroactive effect so as to legalize the relation from the beginning of it, thereby legitimatizing all of the offspring of the cohabitation born during the entire period, and conduct after the passage of the act could not render the offspring of the union illigitimate.

4. It was competent for the defendants to prove that after the war and prior to March 10, 1866, S returned to his former home and lived and cohabited with his former slave wife, but they could not prove this by general reputation.

5. The court properly excluded the following question: "What did S say then was the purpose he had in his mind at the time he married J, in regard to going back down the country as soon as he could, to live with his former wife?" as the law does not deal with what a person thinks, but what he does.

6. There are two essential conditions of the Act of 1879, to-wit: A cohabitation subsisting at the birth of the child and the paternity of the party from whom the property claimed is derived.

ACTION by Chas. S. Nelson against Priscilla Hunter, Administratrix of Jackie Nelson and others, heard by *Judge Chas. M. Cooke* and a jury, at the October Term, 1905, of the Superior Court of WAKE.

Action to recover from defendant, administratrix, the estate of Jackie Nelson, consisting of proceeds of sale of real estate. The following issue was submitted: Is the plaintiff the legitimate child of Jackie and Solomon Nelson? Answer: Yes. The court gave judgment for plaintiff and the defendants appealed.

*S. G. Ryan* for the plaintiff.
*Peele & Maynard* and *J. N. Holding* for the defendants.

BROWN, J. The plaintiff claims the property as the only legitimate child of Jackie Nelson. The defendants claim to share with plaintiff as the illegitimate children of Jackie, alleging that plaintiff is also illegitimate.

Solomon Nelson and Jackie Cook were slaves. There is evidence by plaintiff tending to show that Solomon and Jackie lived together as man and wife during the war; that a marriage ceremony was then performed between them and that this relationship continued to exist at the date of the ratification of the Act of March 10, 1866, and was existing in 1867. There is no evidence that Jackie ever had any other husband than Solomon, and it is admitted that defendants are her illegitimate children, born during slavery and before the alleged cohabitation with Solomon began. There is evidence tending to prove that plaintiff was the only child of Solomon and Jackie and that he was born January 12, 1867. Solomon died before Jackie. There is evidence tending to prove that Solomon was brought to Wake County

by his owner in 1862, and that not long afterwards he and Jackie assumed the relationship of man and wife; that prior to 1862 he resided in Beaufort County, and for five or six years before the war had lived with a female slave named Viley.

The defendants undertook to show that the relation between Solomon and Jackie after the war was not exclusive, and that cohabitation after the war and at the time of the passage of the act had been resumed between Solomon and Viley. *Branch v. Walker*, 102 N. C., 34.

There are some exceptions to evidence by the appellants that·were pressed with earnestness and argued with much ingenuity by their learned counsel, which we will notice.

The first exception relates to the following question: "Did you ever hear Solomon after the surrender say anything about going back to another wife?" This question was properly excluded. It is objectionable because it assumes the very point in controversy—that Solomon had another wife. However, any objection that may have existed to the court's ruling was removed when the same witness said: "I do not think I had any conversation with him (Solomon) in regard to his purpose in going down there or heard him say anything about it."

Second exception: "What was the reputation as to how Solomon and Viley had been living after he returned there (to Beaufort County) and before you went down there?" This question was addressed to witness, David Blount. The evidence of David Blount shows that he did not go to Beaufort County until 1867, and then he saw Solomon down there and he was not living with Viley. Before that time David was in Wake County and knew nothing of any relationship existing between Solomon and Viley prior to March 10, 1866. By virtue of the provisions of that act the relation of man and wife existing between Solomon and Jackie, if continued until the passage of the act, culminated into a valid marriage

and was legalized by the statute. The act has a retroactive effect so as to legalize the relation from the beginning of it, thereby legitimatizing all of the offspring of the cohabitation born during the entire period. If Solomon resumed his cohabitation with Viley after the passage of the Act of March 10, 1866, it could have no effect upon the legitimacy of his and Jackie's children. If his relations with Jackie continued long enough · to have become legalized by the act, his conduct after that could not render the offspring of that union illegitimate, for the act made it a legal relation *ab initio* and capable of transmitting inheritable blood.

The third and fourth exceptions are to the ruling of the court in refusing to allow defendants to prove a general reputation among the Blount negroes and Cook negroes as to whether or not Solomon had a wife living down the country. According to the evidence the Blount negroes were brought to Wake County during the war and the Cook negroes resided there at the home of their owner. If it were competent to prove by reputation such a relationship it must be the reputation in the community where the parties had lived and not the reputation which obtained among the Blount negroes and from whom the Cook negroes had probably heard it. Moreover, if Solomon had left a slave wife in Beaufort County at the beginning of the war, when he was removed to Wake County, it could have no effect upon his relationship with Jackie. It was no bar to his forming a new and exclusive cohabitation with her. There were no legal marriages among slaves and they frequently formed new relations when moved from one place to another. It was competent for the defendants to prove, if they could, that after the war and prior to March 10, 1866, Solomon returned to Beaufort County and lived and cohabited with his former slave wife, Viley, but they could not prove this by mere reputation. The authorities relative to proving a marriage by general reputation have no application. The defendants did not contend that there

was an actual marriage between Solomon and Viley after the war. They only proposed to prove that they had resumed after the war the relation that had existed between them before the war, and that, therefore, the relation with Jackie had terminated before 1866, or was not exclusive at the time of the passage of the act. At that time Solomon and Viley were no longer slaves. They could have contracted a legal marriage. If, then, they entered into an illegal relation and lived as man and wife, it constituted fornication and adultery, and this could not be proved by general reputation.

The fifth exception is to the refusal of the court to allow the following question: "What did Solomon say then was the purpose he had in his mind at the time he married Jackie in regard to going back down the country as soon as he could to live with his former wife?" The sixth, ninth, tenth and eleventh exceptions relate to similar questions and rulings. We think His Honor properly excluded the questions. What Solomon's feelings and purposes were at the time he first made love to Jackie can throw no light on what he actually did some years after. Jackie may have so won his heart that perhaps he forgot all about the charms of Viley. The law does not deal with what a person thinks, but with what he does—his acts—hence what Solomon "had in his mind," whether he intended from the beginning to play Jackie false, is not competent evidence.

The seventh and eighth exceptions to the evidence are untenable and need no discussion.

The court very correctly applied the law in the following paragraphs of the charge, which were excepted to by the defendants: (7) The court instructs the jury that if they shall find that Solomon Nelson and Jackie Cook or Nelson commenced to live together as husband and wife while they were slaves and continued to so live exclusively (as the court has explained to you) until their emancipation, and after

that until the plaintiff, Charles Nelson, was born; and if they shall further find that Charles was born before January 1, 1868, then Charles would be a legitimate child of Jackie, and they should answer the issue yes, although the jury might find that after the birth of the said Charles the said Solomon left the said Jackie, or that he was after that living and co-habiting with another woman and they were living together as man and wife. (8) If the jury shall find that this said relation as of husband and wife, and exclusive in its charac-ter, was commenced between Solomon and Jackie while they were slaves and so continued to and including the 10th of March, 1866, then the court instructs the jury that the said Solomon and Jackie were husband and wife from the date of the commencement of their living together as man and wife, and the said Charles would be a legitimate child, whether born before or after January 1, 1868, and the jury should answer the issue yes.

There is abundant evidence establishing the legitimacy of plaintiff under the provisions of either of the Acts of 1866 or 1879, if credited by the jury. In *Woodard v. Blue,* 103 N. C., 116, *Chief Justice Smith* says there are two essential conditions of the Act of 1879, "a cohabitation subsisting at the birth of the child, and the paternity of the party from whom the property claimed is derived." Under the Act of 1866 the conditions are cohabitation as man and wife be-tween former slaves and its continuance until the ratification of the act. This court, in construing both acts, declares that their provisions were intended to apply for the benefit of those who occupied such relations to each other exclusively and not to others at the same time. *Branch v. Walker, supra.* In this case the parentage of the plaintiff is not disputed, but if it was, all the evidence establishes · it. There is also abundant evidence to go to the jury that the relation of man and wife existed between plaintiff's parents during the war and continued until after plaintiff's birth and until after

March 10, 1866, and there is also evidence that plaintiff was born in 1867. Thus the evidence offered by plaintiff meets the requirements of both acts. As to the exclusiveness of the relation between Solomon and Jackie, we do not find any evidence in the record tending to prove that Solomon, during the same period, had entered into a similar relation with any other woman than plaintiff's mother.

The charge of the court has been examined by us with care. It is a clear, comprehensive, accurate and fair presentation of the case to the jury. We find no error in it. To comment upon each of the many exceptions to it would unduly lengthen this opinion. It is sufficient to say that we have given due consideration to them and find them without merit. The special purpose of the legislation of 1866 and 1879 was to provide against the evil of universal illegitimacy of slave children consequent upon the inability of slaves to enter into the marriage contract. The law may have worked a hardship upon these defendants, who were born of the same mother as plaintiff, and who, but for these statutes, would share equally with him in the property of the mother. But doubtless there are innumerable other cases where the result has been such as to justify the wisdom of their enactment.

Affirmed.